UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

OLMEDO ESPINOZA and TOMAS
LOPEZ, individually and on behalf of all
other persons similarly situated who were
employed by 953 ASSOCIATES LLC and/or
GRACE UNDER FIRE LLC and/or SEAN
CONNOLLY; and/or any other entities
affiliated with or controlled by 953
ASSOCIATES LLC and/or GRACE
UNDER FIRE LLC and/or SEAN
CONNOLLY,

                  Plaintiffs,

   - against -

953 ASSOCIATES LLC, GRACE UNDER
FIRE LLC, SEAN CONNOLLY; and any
other entities affiliated with or controlled by
953 ASSOCIATES LLC and/or GRACE
UNDER FIRE LLC and/or SEAN
CONNOLLY,

                 Defendants.
------------------------------------------------------X

**OPINION AND ORDER**

10 Civ. 5517 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/16/11

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.     INTRODUCTION

        Plaintiffs Olmedo Espinoza and Tomas Lopez (the "Named

Plaintiffs"), and all other similarly situated members of the putative class, bring

this action to recover unpaid minimum wages, unpaid overtime compensation, and

1

improperly withheld tips earned while working at two restaurants, The Eatery and Whym, as servers, hosts, delivery-persons, runners, bus-persons, porters, bartenders, cooks, food preparers, dishwashers, and flyer distributors.  The Eatery is incorporated under the name "953 Associates LLC" while Whym is incorporated under the name "Grace Under Fire LLC."[1]  Defendant Sean Connolly is an individual and the alleged officer, director, president, vice president and/or owner of The Eatery and Whym.[2]

Named Plaintiffs bring their claims under the Fair Labor Standards Act of 1938 ("FLSA"),[3] the New York Labor Law ("NYLL"), and the New York Code of Rules and Regulations ("NYCRR").  In particular, the Named Plaintiffs assert the following causes of action: (1) minimum wage violations under the FLSA;[4] (2) overtime wage violations under the FLSA;[5] (3) unpaid wage violations

---

[1]     *See* Second Amended Complaint ("SAC") ¶¶ 10-11.

[2]     *See id.* ¶ 12.  953 Associates LLC, Grace Under Fire LLC, and Sean Connolly will collectively be referred to as the "Defendants."

[3]     29 U.S.C. § 201, *et seq.*

[4]     *See* First Cause of Action Against Defendants: FLSA Minimum Wage Compensation, SAC ¶¶ 38-49 (alleging violation of 29 U.S.C. § 206).

[5]     *See* Second Cause of Action Against Defendants: FLSA Overtime Compensation, *see id.* ¶¶ 50-54 (alleging violation of 29 U.S.C. § 207).

under the NYLL;[6] (4) minimum wage violations under the NYLL;[7] (5) overtime

wage violations under the NYLL and NYCRR;[8] and (6) improper retention of

gratuities (tips) under the NYLL.[9]  Named Plaintiffs seek collective action status

for their FLSA claims[10] and class action certification for their NYLL claims

pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").[11]  Named

---

[6]      *See* Third Cause of Action Against Defendants: Failure to Pay Wages, *see id.* ¶¶ 55-68 (alleging violation of NYLL §§ 191, 198).

[7]      *See* Fourth Cause of Action Against Defendants: Failure to Pay Minimum Wages, *see id.* ¶¶ 69-79 (alleging violation of NYLL §§ 650, 653).

[8]      *See* Fifth Cause of Action Against Defendants: New York Overtime Compensation Law, *see id.* ¶¶ 80-86 (alleging violation of NYLL § 663 and 12 NYCRR § 137-1.3).

[9]      *See* Sixth Cause of Action Against Defendants: NYLL, Article 6, *see id.* ¶¶ 87-92 (alleging violation of NYLL § 196-d).

[10]     *See* 29 U.S.C. § 216(b) ("section 216(b)") ("An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

[11]     *See* SAC ¶¶ 87-92.  Named Plaintiffs do not assert that their tip-related claims (Sixth Cause of Action) are amenable to class or collective action treatment.  *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Collective Action Certification and Class Action Certification ("Def. Mem.") at 5 ("Named Plaintiffs' Motion addresses only their alleged 'off-the-clock' claims; they do not assert that their tip-related claims are amenable to class or collective action treatment.").

Plaintiffs seek certification of a class consisting of:

> plaintiffs and all current and former employees of The Eatery and Whym restaurants who worked as servers, hosts, delivery-persons, runners, bus-persons, porters, bartenders, cooks, food preparers, dishwashers, flyer distributors, and other restaurant related tasks from July 20, 2004 through the present. Corporate officers, shareholders, directors and administrative employees shall not be part of the proposed class.[12]

Plaintiffs also request that notice of this matter be sent to members of the putative FLSA class to afford such members an opportunity to opt-in to the FLSA collective action. For the following reasons, plaintiffs' motion is granted in part and denied in part.

## II.   FACTUAL BACKGROUND

### A.   Preliminary Matters

#### 1.   Affidavits of Olmedo Espinoza and David Orellana

In support of their motion for collective and class action certification, Named Plaintiff Olmedo Espinoza and opt-in plaintiff David Orellana submitted

---

[12]   Plaintiffs' Memorandum of Law in Support of the Motion for Conditional and Class Certification and Notice to the Class ("Pl. Mem.") at 1. The statute of limitations for plaintiffs' Labor Law claims is six years. *See Dragone v. Bob Bruno Excavating, Inc.*, 847 N.Y.S.2d 251, 253 (3d Dep't 2007) (citing NYLL § 198(3)). The statute of limitations for plaintiffs' FLSA claims is two years or, if plaintiffs can demonstrate willfulness, three years. *See id.* (citing 29 U.S.C. § 255(a)). Given that plaintiffs first filed on July 20, 2010, the FLSA collective action period commences on July 20, 2007, while the class action period commences on July 20, 2004.

affidavits describing the working conditions they endured while employed in Defendants' restaurants.[13]  Defendants argue that while these Affidavits were filed in English, both Espinoza and Orellano admittedly do not speak, write or understand English.  Defendants argue that the Affidavits should be stricken notwithstanding the affiants' statements that they understood the content of their Spanish-translated Affidavits.[14]  According to Defendants, Espinoza and Orellana should have drafted and signed their Affidavits in Spanish.  Plaintiffs' counsel should have then obtained certified translations of those Spanish-language declarations into English.  Instead, the affiants signed Affidavits in English which counsel then translated into Spanish.

        In an attempt to resolve this issue, certified Spanish translations of the Affidavits were provided to the Court by an independent professional translator who is thoroughly proficient in both English and Spanish.[15]  Included with these Spanish translations were Certificates of Accuracy signed by Bozena Brzozowski,

---

[13]     *See* Affidavit of Olmedo Espinoza ("Espinoza Aff.") and Affidavit of David Orellana ("Orellana Aff.") (collectively, the "Affidavits"), Exs. A and C to the Declaration of Lloyd Ambinder in Support of Motion for Conditional and Class Certification ("Ambinder Decl.").

[14]     *See* Espinoza Aff. ¶ 18; Orellana Aff. ¶ 18 (both stating: "I have had this Affidavit translated into Spanish, and I understand its content.").

[15]     *See* Docket Entries ## 72 and 73.

President of G.E.S. Translation Services, stating that Juan M. Pujol accurately translated the Affidavits from English into Spanish.  Furthermore, Named Plaintiffs submitted a statement signed by Juan M. Pujol stating that he carefully translated the Affidavits from English into Spanish.[16]

I decline to strike the disputed Affidavits despite the arguably reverse order in which the translations were made.  Defendants have not cited a controlling rule or case that renders the Affidavits inadmissible.  Furthermore, courts have accepted English-language declarations from Spanish-speaking plaintiffs without dwelling on technical improprieties.[17]

> [T]he fact that Plaintiff did not submit a Spanish language translation of Cuzco's declaration, and instead submitted a separate declaration indicating that the document had been translated, in no way affects the merits of whether this suit should proceed as a representative action.  Defendants' counsel provides no basis – other than mere speculation – to suspect that Cuzco did not understand his declaration[,] what he was signing[,] or that Plaintiff's counsel acted improperly with respect to Cuzco's declaration.  This Court

---

[16]    *See* Ex. W to the Declaration of LaDonna Lusher, Plaintiffs' counsel, in Support of Motion for Conditional and Class Certification.  Apparently, Pujol's statement was submitted in response to Defendants' objection that Brzozowski, not Pujol, signed the Certificates of Accuracy.

[17]    *But see Huang v. J&A Entm't Inc.*, No. 09-cv-5587, 2010 WL 2670703, at *1 (E.D.N.Y. June 29, 2010) (refusing to grant certification for a FLSA collective action until the plaintiff filed a declaration in the declarant's native language, Chinese, together with an English translation certified under oath to be accurate).

6

> finds no reason why these documents should prevent this
> matter from proceeding as a representative action.[18]

Unlike *Cuzco,* here Spanish-language translations were provided to the Court,

which further supports the admissibility of the Affidavits.  In sum, notwithstanding

any procedural defects, I am confident that the representations made in the

English-language Affidavits accurately reflect the statements made by the Spanish-

speaking affiants.  Accordingly, the Affidavits are admitted for purposes of this

motion.

### 2.    Chris Taub's Declaration

Defendants argue that the this Court should strike the Declaration of

Chris Taub[19] because plaintiffs failed to identify him in the initial disclosures

mandated by Rule 26(a) of the Federal Rules of Civil Procedure.  Plaintiffs

describe their failure to disclose Taub initially as an "inadvertent mistake" and

submit that their failure to supplement their disclosures after they learned of

Taub's existence in May 2011 was "harmless error."

In an effort to prevent prejudice to Defendants resulting from the

failure to disclose Taub before his Declaration was proffered, I gave Defendants

---

[18]    *Cuzco v. Orion Builders, Inc.*, 477 F. Supp. 2d 628, 634 (S.D.N.Y. 2007).

[19]    Declaration of Chris Taub ("Taub Decl."), Ex. D to the Ambinder Decl.

the opportunity to depose Taub.  Taub's deposition was taken on September 13,

2011, after which both sides were permitted to file supplemental reply briefs.

Consequently, I see no need to strike the Declaration of Chris Taub.  To assess the

accuracies of Taub's Declaration, I have requested and reviewed his entire

deposition transcript.  Accordingly, I will reference both Taub's Declaration and

his deposition testimony for a fuller account of his factual recitations.

### B.    Plaintiffs' Allegations

#### 1.    Affidavits of Named and Opt-in Plaintiffs

Espinoza worked at The Eatery, from 2002 through 2004, as a

delivery-person, busboy, and runner, and at Whym in 2004, as a runner.[20]  Orellana

worked at The Eatery from the summer of 2006 to the summer of 2007 as a food

preparer.[21]  Opt-in plaintiff Scott Hunt worked at The Eatery from the spring of

2006 to the Spring of 2010 as a server.[22]  Collectively referred to as "Plaintiffs,"

they allege that Defendants failed to pay minimum wages for all hours worked and

failed to pay overtime compensation at time and one half the regular hourly wage

---

[20]    *See* Espinoza Aff. ¶¶ 2-3.

[21]    *See* Orellana Aff. ¶¶ 2-3.

[22]    *See* Affidavit of Scott Hunt ("Hunt Aff."), Ex. B to the Ambinder
Decl., ¶¶ 2-3.

for all hours worked over forty each week.[23]

For example, Hunt alleges that his pay stubs did not reflect all the hours that he worked.[24]  Such inaccuracy was the result of Defendants' policies regarding lunch breaks and clock out times.   Hunt testified as follows with regard to lunch breaks:

> Every day I worked, a full hour was deducted from my paycheck for "lunch".  Since I regularly worked more than 40 hours in a week, this hour was deducted from my overtime hours.  I rarely ever took a lunch break, and if I did, I was required to clock-out first.  As such, every day I was not paid for one hour even though I worked.[25]

Hunt further testified regarding Defendants' "clock out" policy:

> Each day I worked I clocked in at the beginning of the day. At the end of every day I was required to clock out when my last table left.   As soon as I ran my "cash out slip"/"server report" I was told to clock out.  However, after I was required to clock out, I was still required to work at the restaurant for approximately one additional hour because I had to determine my tip-out amounts and how much money I owed the restaurant.  I also had to perform my side work (i.e. folding napkins, cleaning tables,

---

[23]     *See* Espinoza Aff. ¶ 12; Orellana Aff. ¶ 12; Hunt Aff. ¶ 16.

[24]     *See* Hunt Aff. ¶ 10.

[25]     *Id.* ¶ 9.  This concern was shared by Espinoza and Orellana.  *See* Espinoza Aff. ¶ 9 ("Every day I worked, a full hour was deducted from my paycheck for 'lunch'.  I rarely ever took a lunch break, and if I did, I was required to clock-out first."); Orellana Aff. ¶ 9 (same).

restocking items, etc.).[26]

According to Hunt, this "clock out" practice was restaurant policy[27] that was applied to him and his co-workers.[28]

### 2.    Taub's Declaration and Deposition Testimony

Plaintiffs' testimony is corroborated by the Declaration of Chris Taub, who worked at The Eatery in 2009 as a manager.  In addition to corroborating Defendants' lunch break and clock out policies,[29] Taub also explained how he would go into the restaurant's computer system and modify the number of hours worked by each employee.

---

[26]    Hunt Aff. ¶ 11.  These concerns were not shared by Espinoza and Orellana as they did not work as servers.

[27]    *See id.* ¶ 12 ("I was told by my managers . . . that this was the restaurant policy and that even though I was still working, I always had to clock-out when I ran my cash out slip/server report, and if I did not clock out on my own the managers would go in and alter my time records.").

[28]    *See id.* ¶ 13 ("This was restaurant policy.  All of my co-workers who worked as servers were also required to clock out when they ran their cash out slip/server report, and they also had to stay at the restaurant for approximately one additional hour . . . .").

[29]    *See* Taub Decl. at 2-3 ("Even though it was a policy that servers had to clock out when they printed their 'cash out slip'/'server report', the servers were always still working, either doing side work, cleaning tables, or determining their financials and tip-out amounts and how much money they owed the restaurant. The servers were not 'on the clock' for this time and so were not paid for this time. . . . In addition, every day an hour's pay was deducted from every employee for a 'lunch break.'").

> The first thing I did at the beginning of certain work days, being instructed by Sean Connolly, was to print out a list of the employees who were clocked in.  I would then go into the Aloha POS system and modify the workers' hours.  Specifically, I would change the clock-in times to the time the employee was scheduled to start working rather than the actual time the employee start[ed] working.   Workers typically started working before the scheduled shift time.  The only time this was done, was when Sean Connolly instructed me to do so in an efort to "maintain a better labor percentage" as he stated.   At the end of the night, I performed the same task by modifying the computerized time keeping records.   Specifically, I would modify the hours to show an earlier "clock-out" time than the time that the workers actually completed work.  On certain days, I modified the number of hours employees worked.  I did this for almost every employee, regardless of their position . . . .[30]

Taub further declared that "[e]mployees never got breaks."[31]

At his deposition, Taub corroborated the statements he made in his Declaration, in large part.  For example, Taub testified that Defendants routinely required employees to perform off-the-clock work by demanding that servers clock-out at the time they cashed-out, even though they would still have financial paperwork and other side work to complete.[32]  This practice was enforced by every

---

[30]   *Id.* at 2.

[31]   *Id.* at 3.

[32]   *See* Transcript of September 13, 2011 Deposition of Christopher Taub ("Tr.") at 101-03.

manager on a "routine basis."[33]  Taub further substantiated Plaintiffs' claims that

employees rarely took breaks longer than five or ten minutes[34] even though a half

hour of time was automatically deducted from their paychecks on a daily basis to

account for the "family meal" they were provided.[35]  Taub also testified that

Connolly directed him to adjust employees' clock-in and clock-out times to match

the employees' scheduled start and end times, as opposed to their actual start and

end times.[36]  Taub would "shave off" ten to fifteen minutes at the beginning and/or

end of an employee's shift.[37]  Taub adjusted the hours for almost every employee,

regardless of their position, and made such adjustments on an almost daily basis.[38]

---

[33]     *Id.* at 216.

[34]     *See id.* at 75-76 ("And keep in mind that the majority of the times that
they would eat wold be between 5 and 10 minutes; there was no 15, 20, 30 minutes
of sitting and resting, you know, having breaks and whatnot.").  Rest periods of
short duration must be counted as hours worked.  *See* 29 C.F.R. § 785.18 ("Rest
periods of short duration, running from 5 minutes to about 20 minutes, are
common in industry.  They promote the efficiency of the employee and are
customarily paid for as working time.  They must be counted as hours worked.").

[35]     *See id.* at 157.  Taub admitted that the "family meal" was, in fact,
"leftovers from the shift of food that was over prepared for the guests that came
into the restaurant."  *Id.* at 72.

[36]     *See id.* at 133-35.  Short periods of rest must be counted toward hours
worked.

[37]     *Id.* at 143.

[38]     *See id.* at 146, 150.

In sum, Taub's deposition testimony corroborates the statements that he made in his Declaration regarding Defendants' practices and policies of: altering employee time records to reduce the number of hours worked; requiring employees to perform off-the-clock work by clocking-out when cashing-out; and automatically deducting one half hour each day for "family meal" breaks that were never taken.  The fact that Taub testified that some of these some policies and practices were not consistently enforced does not excuse the improper practice as Defendants appear to argue.[39]

## III.   LEGAL STANDARDS

### A.   Collective Action Under the FLSA

The Rule 23 requirements do not apply to a court's approval of a collective action under the FLSA.[40]  Plaintiffs need not show numerosity, typicality, commonality, and adequate representation for collective action certification.  Rather, certification under the FLSA is appropriate where plaintiffs

---

[39]   *See* Defendants' Second Sur-Reply in Opposition to Plaintiffs' Motion for Collective Action Certification and Class Action Certification at 3-4.  In a similar vein, the fact that Taub acknowledged that certain employees received overtime compensation, after he was presented with the actual payroll records for these employees, does not establish a blanket rule that all employees were so compensated.  It appears that, at times, Defendants are trying to litigate the underlying merits of this action, forgetting that this is a certification motion.

[40]   *See Abrams v. General Elec. Co.*, No. 95-CV-1734, 1996 WL 663889, at *1 (N.D.N.Y. Nov. 4, 1996).

have shown that the proposed members of the collective action are "similarly

situated."[41]  The term "similarly situated" is not defined by the FLSA or its

implementing regulations.[42]   Courts have held that the applicable test is whether

plaintiffs have established a sufficient "factual nexus" between their situation and

the situation of the other putative collective action members.[43]  Accordingly,

"courts have held that plaintiffs can meet this burden by making a modest factual

---

[41]      *See Mendoza v. Casa de Cambio Delgado, Inc.*, No. 07 Civ. 2579,
2008 WL 938584, at *1 (S.D.N.Y. Apr. 7, 2008).  Defendants argue that to certify
a FLSA collective action following the close of discovery, Named Plaintiffs must
meet a more stringent or "heightened standard" to show that collective action
members are similarly situated.  According to Defendants, "[t]o meet this higher
burden and show that a group of individuals are similarly situated, Named
Plaintiffs must establish that the putative collective action members were the
victims of '*single decision, policy, or plan*' that violates the FLSA."  Def. Mem. at
13 (emphasis added) (citing *England v. New Century Fin. Corp.*, 370 F. Supp. 2d
504, 510 (M.D. La. 2005).  *Cf. Lin v. Benihana*, 275 F.R.D. 165, 173 (S.D.N.Y.
2011) ("Although the plaintiff need only make a 'modest' showing that the
putative collective action members are similarly situated, the evidence must be
sufficient to demonstrate that [current] and potential plaintiffs together were
victims of *a common policy or plan* that violated the law.") (quotation marks and
citation omitted, alteration in original, emphasis added)).  Whether this
"heightened standard" automatically applies to cases where discovery has closed is
unclear.  *See infra*.  In any event, I find that the Named Plaintiffs and the opt-in
plaintiffs are similarly situated, even under the heightened standard suggested by
Defendants.

[42]      *See Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997);
*Iglesias–Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 367 (S.D.N.Y. 2007).

[43]      *See, e.g., Mentor v. Imperial Parking Sys., Inc.*, 246 F.R.D. 178, 181
(S.D.N.Y. 2007); *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y.
2005).

showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law."[44]  In making this modest factual showing, plaintiffs can rely on the pleadings as supplemented by other evidence, such as affidavits from named plaintiffs, opt-in plaintiffs, or other putative collective action members.[45]

 The Second Circuit has described the following two-step method employed by courts to determine whether they should exercise discretion and certify a collective action under the FLSA:

> district courts "have discretion, in appropriate cases, to implement [§ 216(b) ] . . . by facilitating notice to potential

---

[44] *Realite v. Ark Restaurants Corp.,* 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998).  *Accord Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 322 (S.D.N.Y. 2007) ("Conditional class certification is appropriate here where all putative class members are employees of the same restaurant enterprise and allege the same types of FLSA violations."); *Williams v. Twenty Ones, Inc.*, No. 07 Civ. 3978, 2008 WL 2690734, at *1–2 (S.D.N.Y. June 30, 2008) (certifying FLSA collective action of sports bar's office workers, waiters, bartenders, runners, and bussers where defendants allegedly violated the FLSA in "multiple ways" – where no single FLSA violation affected every collective action member but each member was affected by at least one alleged violation).

[45] *See Fasanelli*, 516 F. Supp. 2d at 321 ("[T]he appropriate inquiry . . . is whether the putative class alleged by Plaintiffs is similarly situated based on the pleadings and any affidavits."); *Prizmic v. Armour, Inc.*, No. 05 CV 2503, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006) (stating that mere allegations in a complaint are not sufficient to meet the standard for collective action certification and that "some factual showing by affidavit or otherwise must be made") (quotation marks and citation omitted).

plaintiffs" of the pendency of the action and of their opportunity to opt-in as represented plaintiffs. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). In determining whether to exercise this discretion in an "appropriate case[ ]," the district courts of this Circuit appear to have coalesced around a two-step method, a method which, while again not required by the terms of FLSA or the Supreme Court's cases, we think is sensible. The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be "similarly situated" to the named plaintiffs with respect to whether a FLSA violation has occurred. *See, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1258-62 (11th Cir. 2008); *Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006) (Lynch, J.); *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.). The court may send this notice after plaintiffs make a "modest factual showing" that they and potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." *Sbarro*, 982 F.Supp. at 261. . . . The "modest factual showing" cannot be satisfied simply by "unsupported assertions," *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991), but it should remain a low standard of proof because the purpose of this first stage is merely to determine whether "similarly situated" plaintiffs do in fact exist, *see Sbarro*, 982 F.Supp. at 261. At the second stage, the district court will, on a fuller record, determine whether a so-called "collective action" may go forward by determining whether the plaintiffs who have opted in are in fact "similarly situated" to the named plaintiffs. The action may be "de-certified" if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice.[46]

---

[46]    *Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010) (footnotes and parallel citations omitted) (brackets in original).

The Second Circuit further explained that

> while courts speak of "certifying" a FLSA collective action,
> it is important to stress that the "certification" we refer to
> here is only the district court's exercise of the discretionary
> power, upheld in *Hoffmann-La Roche*, to facilitate the
> sending of notice to potential class members. Section
> 216(b) does not by its terms require any such device, and
> nothing in the text of the statute prevents plaintiffs from
> opting in to the action by filing consents with the district
> court, even when the notice described in *Hoffmann-La
> Roche* has not been sent, so long as such plaintiffs are
> "similarly situated" to the named individual plaintiff who
> brought the action. *See Morgan v. Family Dollar Stores,
> Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008) (noting that
> "certification" of a collective action is a device to facilitate
> notice to potential class members and does not actually
> "create a class of plaintiffs" for a FLSA collective action).
> Thus "certification" is neither necessary nor sufficient for
> the existence of a representative action under FLSA, but
> may be a useful "case management" tool for district courts
> to employ in "appropriate cases." *Hoffmann-La Roche*, 493
> U.S. at 169, 174.[47]

Thus, it appears that the "similarly situated" inquiry is done at two

discrete points in time: first, before notice to potential opt-in class members is sent;

and second, at a later time when the record is more fully developed. "During the

second stage, the court undertakes a more stringent factual determination as to

whether members of the class are, in fact, similarly situated."[48]  Whether the

---

[47]      *Id.* at 555, n.10 (parallel citations omitted).

[48]      *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368
(S.D.N.Y. 2007).

17

second stage heightened scrutiny automatically applies where discovery has closed is open to debate.[49]  In any event, the decision to certify a collective action under the FLSA appears to be of little legal consequence given the Second Circuit's description of such as a "case management tool."

### B.    Class Action Under Rule 23

Rule 23 governs the certification of class actions in federal courts and its requirements are more stringent than those of the FLSA.[50]  Nevertheless, courts in the Second Circuit "apply a liberal, rather than restrictive, interpretation to Rule 23."[51]  Rule 23 sets forth the following four prerequisites for a class action:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately

---

[49]     *See Cunningham v. Electronic Data Sys. Corp.*, 754 F. Supp. 2d 638, 645 (S.D.N.Y. 2010) ("Even where the parties have undertaken substantial discovery, our courts have continued to use the first-stage certification analysis.") (citing cases).

[50]     *See Iglesias–Mendoza*, 239 F.R.D. at 368 ("The 'similarly situated' standard for certifying a [collective] action is thus considerably more liberal than class certification under Rule 23.").

[51]     *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 202 (S.D.N.Y. 2006).

protect the interests of the class.[52]

Plaintiffs bear the burden of establishing these four prerequisites by a preponderance of the evidence.  In addition, while "'Rule 23(a) does not expressly require that a class be definite in order to be certified[,] a requirement that there be an identifiable class has been implied by the courts.'"[53]  This requirement is often referred to as "ascertainability."[54]  Plaintiffs must also qualify under one of the subdivisions of Rule 23(b).[55]

A district court undertakes a "rigorous analysis" and "assess [es] all of the relevant evidence admitted at the class certification stage [to] determine whether each Rule 23 requirement has been met."[56]  In deciding a Rule 23 certification motion, courts generally should not decide the merits of the

---

[52]     Fed. R. Civ. P. 23(a).  *See also Amchem Prods. v. Windsor*, 521 U.S. 591, 613 (1997).

[53]     *Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003) (quoting *Zapka v. Coca-Cola Co.*, No. 99 Civ. 8238, 2000 WL 1644539, at *2 (N.D. Ill. Oct. 27, 2000)).

[54]     *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 336 (S.D.N.Y. 2002).

[55]     *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *Marisol A. v. Giuliani*, 126 F.3d 372, 375–76 (2d Cir. 1997).

[56]     *In re Initial Pub. Offerings Sec.. Litig.*, 471 F.3d 24, 33, 42 (2d Cir. 2006).

underlying action unless they are related to, and implicated by, the determination of whether the Rule 23 prerequisites have been satisfied.[57]  "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification."[58]

### 1.    Numerosity

Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable."[59]  Courts in the Second Circuit presume numerosity when the putative class has at least forty members.[60]

### 2.    Commonality

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class."[61]  Commonality may be met even though class members' individual circumstances differ, so long as their "'injuries derive from a

---

[57]    *See id.* at 41 (requiring "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues").

[58]    *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (quotation marks and citations omitted).

[59]    Fed. R. Civ. P. 23(a)(1).

[60]    *See Gortat*, 257 F.R.D. at 362.

[61]    Fed. R. Civ. P. 23(a)(2).

unitary course of conduct.'"[62]

### 3.   Typicality

A class representative's claims are "typical" under Rule 23(a)(3), where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove defendants' liability.[63] "While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."[64]

### 4.   Adequacy

Plaintiffs must also show that the proposed action will fairly and adequately protect the interests of the class.[65]  To do so, proposed class representatives must demonstrate that they have no interests that are antagonistic to

---

[62]     *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 338 (S.D.N.Y. 2004) (quoting *Marisol A.*, 126 F.3d at 377).

[63]     *See Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001).

[64]     *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (citation omitted).

[65]     *See* Fed. R. Civ. P. 23(a)(4); *Banyai v. Mazur*, 205 F.R.D. 160, 164 (S.D.N.Y. 2002).

the proposed class members.[66]  In addition, courts have considered other factors,

such as whether the putative representatives are familiar with the action, whether

they have abdicated control of the litigation to class counsel,[67] and whether they are

of sufficient moral character to represent a class.[68]

### 5.    Implied Requirement of Ascertainability

To bridge the "wide gap" between an individual's claim and "the

existence of a class of persons who ha[s] suffered the same injury as the

individual," plaintiff must demonstrate the existence of an "aggrieved class."[69]

Plaintiff must also demonstrate that the aggrieved class can be readily identified.[70]

"A class's definition will be rejected when it 'requires addressing the central issue

---

[66]    *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *see also Robinson*, 267 F.3d at 170 (noting that Rule 23(a)(4) requires an "absence of conflict" between the named representatives and the class members as well as "vigorous prosecution").

[67]    *See* 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.21[4] (3d ed. 2003) (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec.*, 185 F.R.D. 172, 175-76 (S.D.N.Y. 1999), *aff'd in part, vacated in part by Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)).

[68]    *See, e.g.*, *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998).

[69]    *Sheehan v. Purolater, Inc.*, 839 F.2d 99, 102 (2d Cir. 1988) (denying class certification because plaintiff failed to establish proof of an aggrieved class).

[70]    *See Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) (denying class certification because it would have been a "Sisyphean task" to identify those individuals with viable claims).

of liability in a case' and therefore the inquiry into whether a person is a class member 'essentially require[s] a mini-hearing on the merits of each [plaintiff's] case.'"[71]   Class members need not be ascertained prior to certification, but must be ascertainable at some point in the case.[72]

### 6.   Rule 23(b)(3) Requirements

In addition, to certify a damages class pursuant to Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[73]

> The predominance requirement is more demanding than the commonality requirement in Rule 23(a): Plaintiffs must show that the case is subject to generalized proof applicable to the class as a whole. *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/Mastermoney Antitrust Litig.)*, 280 F.3d 124, 136 (2d Cir. 2001).   In order to determine whether general proof predominates, courts must determine that the issues subject to generalized proof outweigh those issues that are subject to individualized proof.   *See Augustin v. Jablonsky (In re Nassau County Strip Search*

---

[71]   *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 55 (S.D.N.Y. 2000) (quoting *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (alterations in original)).

[72]   *See In re MTBE*, 209 F.R.D. at 337 (citation omitted).

[73]   Fed. R. Civ. P. 23(b)(3).

*Cases)*, 461 F.3d 219, 227-28 (2d Cir. 2006).[74]

The "Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[75]  The focus of the predominance inquiry is on defendants' liability, not on damages.[76]

## III.   DISCUSSION

### A.   Modification of the Proposed Class Is Warranted

The class, for purposes of the collective action under the FLSA and the class action under Rule 23, must exclude those employees who worked exclusively at Whym.  Plaintiffs have failed to establish that Whym's employees are similarly situated to one another, or similarly situated to The Eatery's employees, under section 216(b) and Rule 23.

Olmedo Espinoza is the only plaintiff this Court is aware of who worked at Whym.  Espinoza worked at Whym in 2004, which is outside the three-year FLSA limitations period.  From his Affidavit, it is apparent that Espinoza

---

[74]     *Eldred v. Comforce Corp.*, No. 3:08-CV-1171, 2010 WL 812698, at *19 (N.D.N.Y. Mar. 2, 2010).

[75]     *Amchem*, 521 U.S. at 623.

[76]     *See In re Visa Check*, 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.").  *See also Smilow v. Swiss Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("The individuation of damages in . . . class actions is rarely determinative under Rule 23(b)(3).").

worked primarily at The Eatery and that his time at Whym was brief and

incidental.  Furthermore, Taub's testimony does not refute Defendants' position

that the two restaurants are run by "separate and entirely independent management

teams."[77]

> Q:     You don't have any idea about how the time-keeping
>         practices worked at Whym, do you?
>
> A:     I know nothing of any type of operations at Whym.
>         it was completely separate from anything that I was
>         involved with at Eatery.[78]

It is thus evident that Taub has no knowledge of the policies at Whym.   Coupled

with Plaintiffs' failure to otherwise address Whym, the collective and certified

class cannot include employees of Whym.   Accordingly, the collective and

certified class is hereby modified to exclude the current and former employees of

Whym.  However, as discussed below, Plaintiffs have shown that the current and

former employees of The Eatery are similarly situated for purposes of the FLSA

and meet the class action certification requirements of Rule 23.

---

[77]     Declaration of Sean Connolly in Support of Defendants' Opposition
to Plaintiffs' Motion for Collective Action and Class Certification ¶ 5.  *See id.* ¶ 4
("I primarily act as the general manager for Eatery and Evan Kushner . . . is the
general manager at Whym. . . . I generally do not supervise the putative class
members who work at Whym.").

[78]     Tr. at 54.

**B.      Plaintiffs Are Similarly Situated**

Plaintiffs have alleged that they and their coworkers performed the same type of restaurant-related tasks and that their "payroll check[s] did not accurately reflect all hours that [they] worked."[79]  Plaintiffs also alleged that a full hour was deducted from their overtime as a result of the "family meal" provided by Defendants.[80]  Plaintiff Hunt further alleged that he was required to work off-the-clock for approximately one hour each shift as a result of Defendants' "clock out" practice which he described as restaurant policy.[81]  Plaintiffs' allegations were corroborated, in large part, by former manager Christopher Taub.   Based on their conversations with particular co-workers, Plaintiffs stated that their co-workers experienced the same wage violations that they did.[82]  To date, nineteen individuals have joined this action, alleging claims similar to those alleged by Espinoza, Orellana and Hunt.

In sum, Plaintiffs have sufficiently established a colorable basis for their claims that The Eatery is engaged in a policy and practice of failing to pay its

---

[79]      Espinoza Aff. ¶ 8; Orellana Aff. ¶ 8; Hunt Aff. ¶ 8.

[80]      *See id.* ¶ 9; *see id.* ¶ 9; *see id.* ¶ 9.

[81]      *See* Hunt Aff. ¶¶ 11-13.

[82]      Espinoza Aff. ¶¶ 13-14; Orellana Aff. ¶¶ 13-14; Hunt Aff. ¶¶ 17-18.

employees appropriate amounts of minimum wages and overtime compensation.

In light of the affidavits submitted, and the Declaration and deposition of Taub, I

find that Plaintiff have

> set forth some of the factual bases for their claims along
> with their knowledge of the applicability of their claims to
> members of the proposed class.  The [N]amed [P]laintiffs
> have adequately alleged that they together with the
> proposed class members were subjected to common wage
> [and] overtime . . . practices that violated the FLSA.
> Having done so, they are entitled to proceed in a
> representative capacity.[83]

Because Plaintiffs have shown that they are similarly situated with regard to their

FLSA claims, their  motion for collective action certification under section 216(b)

is granted.  Plaintiffs are hereby authorized to send potential class members notice

that they may opt-in to this lawsuit.[84]

### C.    Plaintiffs Have Met the Four Rule 23(a) Prerequisites and the Implied Requirement of Ascertainability

Plaintiffs have satisfied the four prerequisites to class action

certification as well as the implied requirement of ascertainability.[85]

---

[83]    *Iglesias-Mendoza*, 239 F.R.D. at 368.

[84]    Of course, the applicable starting date for plaintiffs' FLSA suit is July 20, 2007, *see supra* n.12, and the employees of Whym are obviously excluded.

[85]    The class, as modified herein, is easily identified from The Eatery's payroll records.  Thus, the implied requirement of ascertainability is satisfied.

27

With regard to numerosity, plaintiffs have established that the putative class would consist of 150 to 200 employees.[86]  Defendants' argument that joinder is practicable[87] overlooks the fact that the collective action relates solely to plaintiffs' FLSA claims.  Certifying this action as a class action would promote judicial economy by avoiding as many as 150 to 200 separate Labor Law actions. Thus, it is evident that the class is so numerous that joinder is impracticable, thereby satisfying numerosity.

With regard to commonality, the Named Plaintiffs' claims and those of the members of the putative class arise from a common wrong: Defendants' failure to pay proper minimum wage and overtime compensation for work performed by plaintiffs in any given work week.  Defendants' practice and policy regarding "family meal" breaks, cashing out of servers, and altering clock-in and clock-out times had a common impact on class members.  "The commonality requirement may be met when individual circumstances of class members differ,

---

[86]   *See* Espinoza Aff. ¶ 7; Hunt Aff. ¶ 7.

[87]   *See* Def. Mem. at 19-20 ("In fact, by simultaneously moving for collective action certification, they have explicitly admitted that joinder *is* practicable because it is well-established that a collective action is a mechanism for joining parties in a lawsuit.").

but 'their injuries derive from a unitary course of conduct.'"[88]  Defendants'

argument that plaintiffs' "off-the-clock" claims would require this Court to

determine liability on an individualized basis confuses liability with damages.

"The critical inquiry is whether the common questions are at the 'core' of the cause

of action alleged."[89]  In fact, claims by workers that their employers have

unlawfully denied them wages to which they were legally entitled have repeatedly

been held to meet the commonality prerequisite for class certification.[90]  Thus,

commonality is satisfied here.

---

[88]     *Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2005 WL 106895, at *2 (S.D.N.Y. Jan. 19, 2005) (quoting *Marisol A.*, 126 F.3d at 377).

[89]     *Id.* (quotation marks and citation omitted).

[90]     *See, e.g., Jankowski v. Castaldi*, No. 01CV0164, 2006 WL 118973, at *2–3 (E.D.N.Y. Jan. 13, 2006) (finding commonality among plaintiffs who alleged that they had been denied overtime wages pursuant to defendants' policy); *Noble*, 224 F.R.D. at 343 (finding commonality where potential class members alleged harm from defendants' common practice  of failing to adequately compensate them for overtime hours in violation of New York Labor Law); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y. 2001) ("The differences among Plaintiffs as to the number of hours worked, the precise work they did, and the amount of pay they received concern the amount of damages to which any individual Plaintiff might be entitled if and when liability is found.  It is well-established that individual questions with respect to damages will not defeat class certification . . . unless that issue creates a conflict which goes to the heart of the litigation.");  *Cuzco v. Orion Builders*, 262 F.R.D. 325, 334 n.20 (S.D.N.Y. 2009) (finding that defendant's pay practices were common to the class and thus met the commonality requirement).

The typicality requirement is also satisfied.  The central inquiry in a typicality evaluation is whether "each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove defendant's liability."[91]  Here, the minimum wage and overtime claims alleged by Plaintiffs are similar to those of the class members  and arise from the same allegedly unlawful practices and policies (*i.e.*, cash-out, "family meal"  deduction, adjustment to hours worked).  Typicality is satisfied despite differences in damages arising from a disparity in injuries among the class members.  "Where the named plaintiff as well as members of the proposed class all have similar claims arising from the same scheme, the typicality requirement is satisfied regardless of whether different facts underlie each class member's claim."[92]

Finally, with regard to adequacy, Defendants argues that class certification should be denied because Named Plaintiffs are inadequate class representatives.  Defendants claim that Named Plaintiffs have been "absent" and "derelict in their duties" throughout this litigation and "have utterly failed to protect the putative class members' interests in this Action."[93]  Defendants point

---

[91]     *Velez*, 2005 WL 106895, at *2.

[92]     *Piper v. Portnoff Law Assocs.*, 216 F.R.D. 325, 329 (E.D. Pa. 2003).

[93]     Def. Mem. at 20.

out that Named Plaintiff Tomas Lopez did not file an affidavit in support of the instant motion and that Named Plaintiffs failed to adequately prosecute this action as evidenced by their failure to take a single deposition.

The absence of an affidavit from Named Plaintiff Lopez is of no moment given the Affidavit from Named Plaintiff Espinoza and the Affidavits from opt-in plaintiffs Orellana and Hunt.  Moreover, other than the deposition of Christopher Taub, which was the subject of post-discovery judicial intervention, neither party took a single deposition in this case.  Plaintiffs attribute this to the fact that the parties spent most of the discovery period trying to reach a settlement of this action.[94]  To hold this litigation strategy against the Named Plaintiffs would be unfair given their complete lack of familiarity with the governing law. Moreover, there are no antagonistic interests or conflicts between Named Plaintiffs and the class members.  Named Plaintiffs have expressed a genuine desire to represent the class in an attempt to receive the wages due them and have hired the law firm Virginia & Ambinder, LLP to further this end.[95]  In short, Defendants

---

[94]    The discovery period could be re-opened, upon motion of either party, if the Court finds good cause for doing so.

[95]    Although the appointment of class counsel is outside the scope of the instant motion, this Court has reviewed the factors set forth in Rule 23(g)(1)(A) and does not foresee any problem in appointing Virginia & Ambinder as class counsel when the plaintiffs so move.

have not rebutted the Named Plaintiffs' showing of adequacy.

### D.     Rule 23(b)(3)

Courts have often found the predominance requirement satisfied

despite individual differences in the amount of damages.  As stated in *Ramos v.*

*SimplexGrinnell LP*,

> numerous courts have found that wage claims are especially
> suited to class litigation—perhaps "the most perfect
> questions for class treatment"—despite differences in hours
> worked, wages paid, and wages due. *Iglesias–Mendoza v.
> La Belle Farm, Inc.*, 239 F.R.D. 363, 373 (S.D.N.Y. 2007).
> *See, e.g., Eldred*, 2010 WL 812698, at *19 (granting
> plaintiffs' motion for class certification for their prevailing
> wage claim); *Alleyne v. Time Moving & Storage Inc.*, 264
> F.R.D. 41, 49 (E.D.N.Y. 2010) (holding that "differences
> among class members as to the number of hours worked,
> the precise work they did and the amount of pay they
> received concern the amount of damages to which any
> individual class member might be entitled, not the
> amenability of their claims to Rule 23 certification.");
> *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *4–5
> (E.D.N.Y. Apr. 9, 2010); *Cuzco*, 262 F.R.D. at 334–35;
> *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 159
> (S.D.N.Y. 2008) (rejecting defendant's argument that
> individual issues predominate and finding that defendant's
> common, uniform policies established predominance);
> *Barone v. Safway Steel Prods., Inc.*, 2005 WL 2009882, at
> *6 (E.D.N.Y. Aug. 23, 2005) (finding that common issues
> predominate in a prevailing wage class action); *Noble*, 224
> F.R.D. at 345 (concluding that, "[a]lthough determinations
> as to damages . . . will require individualized findings,
> common liability issues otherwise predominate"); *Bolanos*,
> 212 F.R.D. at 148 (holding "different . . . departments kept
> track of overtime using different methods, differences in

> departments, job duties, and even factual variations in
> plaintiffs' claims should not defeat class certification . . .
> where all plaintiffs claim they were denied overtime");
> *Ansoumana*, 201 F.R.D. at 89 (certifying a class alleging
> violations of the New York Minimum Wage Act).[96]

"Similarly, New York state courts have repeatedly approved class certification of
prevailing wage claims against an employer."[97]  Because liability can be
determined on a class-wide basis, the requirements of Rule 23(b)(3) have been met.
Accordingly, the class proposed by Named Plaintiffs, as modified by this Court, is
hereby certified pursuant to Rule 23(a) and (b)(3).

### E.   *Wal-Mart Stores, Inc. v. Dukes* Is Inapposite

The Supreme Court's recent decision in *Wal–Mart Stores, Inc. v.
Dukes*[98] does not command a different result.  In *Wal-Mart*, a class of
approximately 1.5 million employees who worked in 3,400 stores nationwide
alleged that Wal-Mart discriminated against them on the basis of their sex by
denying them equal pay and promotions in violation of Title VII of the Civil
Rights Act of 1964.[99]  Their claims were based on the countless subjective

---

[96]   No. 07–CV–981, 2011 WL 2471584, at *8 (E.D.N.Y. June 21, 2011).

[97]   *Id.* (citing cases).

[98]   564 U.S. ——, 131 S. Ct. 2541 (2011).

[99]   *See id.* at 2547.

decisions made by Wal-Mart's local supervisors regarding compensation and

promotions.[100]

> The Supreme Court stated the following with regard to commonality:
>
>> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury[.]"  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways – by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.[101]

The Supreme Court reversed the lower courts' grant of certification because

plaintiffs could not demonstrate commonality under Rule 23(a)(2).  In finding a

---

[100]    *See id.* at 2548 ("These plaintiffs . . . do not allege that Wal–Mart has any express corporate policy against the advancement of women.  Rather, they claim that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees[.]").

[101]    *Id.* at 2551 (citation omitted).

lack of commonality, the Supreme Court agreed with Chief Judge Kozinski of the

Ninth Circuit that the members of the class:

> "held a multitude of different jobs, at different levels of
> Wal–Mart's hierarchy, for variable lengths of time, in 3,400
> stores, sprinkled across 50 states, with a kaleidoscope of
> supervisors (male and female), subject to a variety of
> regional policies that all differed . . . . Some thrived while
> others did poorly. They have little in common but their sex
> and this lawsuit." 603 F.3d[] [571,] at 652 [(9th Cir. 2010)]
> (dissenting opinion).[102]

The Supreme Court noted that in deciding plaintiffs' Title VII claims, the crux of

the inquiry would be the reasons for the particular employment decisions.[103] This

would require analyzing millions of subjective employment decisions and would

not result in a common answer as to why each employee was a victim of alleged

discrimination.[104]

    The facts and circumstances of *Wal-Mart* are very different from the

instant action. Here, Plaintiffs allege that Defendants failed to pay minimum

---

[102]    *Id.* at 2557.

[103]    *See id.* at 2552.

[104]    *See id.* ("Here respondents wish to sue about literally millions of
employment decisions at once. Without some glue holding the alleged *reasons* for
all those decisions together, it will be impossible to say that examination of all the
class members' claims for relief will produce a common answer to the crucial
question *why was I disfavored*.") (emphasis in original).

wages and overtime compensation as a result of certain policies and practices. Although plaintiffs' claims may raise individualized questions regarding the number of hours worked and how much each employee was entitled to be paid, those differences go to the damages that each employee is owed, not to the common question of Defendants' liability. Plaintiffs have alleged a common injury that is capable of class-wide resolution without inquiry into multiple employment decisions applicable to individual class members. Accordingly, *Wal-Mart* is distinguishable and does not preclude class certification for those current and former employees of The Eatery.[105]

## IV. CONCLUSION

For the foregoing reasons, collective action status is granted under section 216(b) with regard to plaintiffs' FLSA claims.[106] Accordingly, notice of this action may be sent to potential opt-in plaintiffs. Furthermore, the following class is certified with regard to plaintiffs' New York Labor Law claims:

> plaintiffs and all current and former employees of The Eatery restaurant who worked as servers, hosts, delivery-

---

[105] However, *Wal-Mart* provides further support of the need to modify the definition of the proposed class to exclude current and former employees of Whym based on insufficient evidence that Whym employees share common issues with employees of The Eatery.

[106] As stated earlier, the date of commencement of the collective action is July 20, 2007. *See supra* n.12.

persons, runners, bus-persons, porters, bartenders, cooks, food preparers, dishwashers, flyer distributors, and other restaurant related tasks from July 20, 2004 through the present. Corporate officers, shareholders, directors and administrative employees shall not be part of the proposed class.

The Clerk of the Court is directed to close plaintiffs' Motion to Certify Class

(Docket Entry # 50). A status conference is scheduled for December 6, 2011, at

4:30 p.m., in Courtroom 15C, in the event that this action is not settled by then.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 16, 2011

37

## - Appearances -

**For Plaintiffs:**

Lloyd Ambinder, Esq.
LaDonna M. Lusher, Esq.
Virginia & Ambinder, LLP
111 Broadway, Suite 1403
New York, NY 10006
(212) 943-9080

**For Defendants:**

Glenn S. Grindlinger, Esq.
Eli Z. Freedberg, Esq.
Fox Rothschild LLP
100 Park Avenue
New York, NY 10017
(212) 878-7900